# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
May 2, 2006 Session

## STATE OF TENNESSEE v. FRANKLIN FITCH

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-07320    James C. Beasley, Jr., Judge**

————————

**No. W2004-02833-CCA-R3-DD  - Filed November 2, 2006**

————————

A Shelby County jury found the defendant, Franklin Fitch, guilty of the first degree premeditated murder of Angela Carroll.  Following a separate penalty phase, the jury found the presence of two statutory aggravating circumstances and that the aggravators outweighed any mitigating factors.  The jury subsequently imposed a sentence of death.  The defendant seeks review by this court of both his conviction for first degree murder and his sentence of death.  He challenges: (1) the trial court's denial of his motion to suppress, (2) the sufficiency of the convicting evidence of first degree murder, (3) the trial court's admission of post-mortem photographs of the victim, (4) the trial court's instruction on premeditation, (5) the prosecutor's closing argument, (6) the sufficiency of the (i)(2) aggravating circumstance, (7) the trial court's instruction that reckless endangerment is an offense of violence, (8) the sufficiency of the (i)(3) aggravating circumstance, (9) the trial court's admission of victim impact testimony, (10) the trial court's jury instruction regarding victim impact evidence, (11) the failure to charge aggravating circumstances in the indictment, and (12) the constitutionality of Tennessee's death penalty statutes.  Following our extensive review, we affirm the defendant's conviction of first degree murder.  However, we conclude that the evidence does not support application of the (i)(2) statutory aggravating circumstance.  As we are unable to conclude that this error is harmless, this matter is remanded for a new sentencing hearing.

**Tenn. R. App. P. 3 Appeal as of Right;  Judgment of the Criminal Court Affirmed in Part, Reversed in Part and Remanded for Re-sentencing**

J.C. MCLIN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, J., joined.

Phyllis Aluko and Tony N. Brayton, (on appeal) and Diane Thackery and Larry Nance (at trial), Assistant Public Defenders, Memphis, Tennessee, for the appellant, Franklin Fitch.

Paul G. Summers, Attorney General and Reporter; Michelle Chapman McIntire, Assistant Attorney General; William L. Gibbons, District Attorney General; and Lee Coffee and Stacy McEndree, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## Guilt Phase

On February 28, 2002, Angela Carroll was murdered. At the time of her death, she was the mother of four boys, ages six, seven, nine and ten. She was also an employee at the Spring Gate Nursing Home. Ms. Carroll had been involved in a romantic relationship with the defendant and the couple had lived together for three and one-half years. Approximately one month prior to her murder, Ms. Carroll and her children left the home they shared with the defendant and moved into an apartment on Huntington Ridge.

On February 28, 2002, Viola Edwards, a nurse assistant was at her job on the 3 to 11 shift at the Spring Gate Nursing Home. Ms. Edwards was assigned to station three that evening, which was "mixed with skilled and non-skilled [patients]," meaning some patients were ambulatory and some patients were bedridden. Station two, another station, was comprised solely of skilled patients, or bedridden patients. Station two was comprised of about twenty patients on that date.

Close to the dinner hour, Ms. Edwards observed the defendant approach the nurses' station. The defendant asked whether Ms. Edwards knew Angela Carroll and stated that she was his wife. Ms. Edwards asked another lady in the dining room where Ms. Carroll was working. This employee informed Ms. Edwards that Ms. Carroll was working at station two. The defendant asked where station two was located and Ms. Edwards directed him to station one then pointed the way to station two. This was the last time that Ms. Edwards saw the defendant. At no time during this brief encounter did Ms. Edwards detect any odor of alcohol on the defendant's person. Nor did Ms. Edwards observe any behavior on behalf of the defendant to indicate that he was intoxicated. Ms. Edwards later related that the defendant did not appear excitable, anxious or angry. Rather, Ms. Edwards recalled that the defendant appeared calm.

Carole Keeley, a registered nurse, supervised the nursing assistants on her shift. Sometime after the shift started, Ms. Keeley was seated at the nursing desk with Emma Holliman, the director for social services. At some point, Ms. Keeley observed that Angela Carroll was an extra CNA that day. Ms. Keeley "turned around and told Angela that she could work [on station two] . . . . Turned around and told her she could work. And a man came up from behind her, crouched down and shot her from behind. . . ." Angela Carroll was standing just a few feet from Ms. Keeley on the other side of the desk. At the sound of the first shot, Ms. Keeley immediately went beneath the desk. She then heard the sound of Angela running into the bathroom. Ms. Keeley, from her shielded position, observed the shooter follow her into the bathroom, the gun at his side. Throughout the incident, Ms. Keeley never heard the man say

anything to Ms. Carroll.  Ms. Keeley could hear Angela in the bathroom, saying "help me" at least two or three times.  In total, Ms. Keeley recalled five or six gunshots, "[h]e was shooting her from the time she turned around and was running into the bathroom and on into the bathroom."  The whole incident happened very abruptly and was over in a matter of minutes.  Ms. Keeley only observed the shooter from the side.  She described him as being "there for a purpose."  "[H]is gait was steady. . . [h]e didn't act like he was drinking. . . he was steadily walking into the bathroom . . . along with her."

Ms. Keeley called the police after she heard the man's footsteps walking back out of the bathroom.  He did not run out of the nursing home, he walked out.  The room was very smoky and smelled of smoke.  People were screaming.  Angela Carroll never came out of the bathroom.  Ms. Keeley made her way to the bathroom to try to assist Angela.  Angela was lying face down on the floor.  Ms. Keeley turned her over and observed a gunshot in her shoulder and several more in her abdomen.  Angela took one more breath when "they" turned her back over, "but then she – she died."

Ms. Keeley later discovered a "shot in a chair," the chair she had been sitting in at the desk.  A bullet had also broken a window going into one of the residents' room.  Two people were in that room at the time of the shooting.  These people were bedridden and unable to care for themselves.

Emma Holliman later recalled that, around the time of the shooting, "[p]eople were around the station there.  The staff at the station, nursing staff.  There were family members in the hall who were visiting their relatives and the patients' rooms were in the line of fire.  We had residents who were in danger."  She estimated there may have been "ten to fifteen people" in the line of fire.  Ms. Holliman noticed that, during the incident, the defendant appeared "calm.  He followed her to the back shooting her, cursing her, calling her names."  Specifically, Ms. Holliman related that the defendant stated, "Now you dirty bitch, you dirty whore, I told you I was going to get you."  After he finished shooting Ms. Carroll, the defendant "took the gun and put it in the back of his pants."  He then looked directly into Ms. Holliman's face.  At this time, Ms. Holliman feared that the defendant was going to kill her.  Ms. Holliman stated that there was no indication from his appearance that he was in any way under the influence of an intoxicant.  The defendant then "calmly walked down the hall."

After he left, Ms. Holliman "ran around the corner and . . . looked in the room to see if the two patients were right there who would have been in the direct line of fire first to see if they were okay."  She then used the telephone from another room to call 911.

From the dining room, Ms. Edwards observed the defendant running out toward a white car, getting into the car from the passenger's side and pulling out of the driveway.  The defendant later arrived at the Kentucky Fried Chicken restaurant on South Parkway at approximately seven o'clock.  He walked into the restaurant and announced to "practically everybody in the store that he had just shot someone."  He "kept ranting and raving to call the police."  Michelle Wembley,

the assistant manager, described the defendant as "real feisty and just real loud and arrogant." She recalled him stating, "Goddamnit, I said call the police. I just shot somebody." Ms. Wembley asked him if he was "going to sit there and wait." He replied that he was and Ms. Wembley called the police. Ms. Wembley observed that the defendant had a forty-ounce Colt 45 beer bottle in a paper sack, that he drank while sitting at a table. Ms. Wembley did not describe the defendant as being "drunk." He stayed at the table until the police arrived at the location within five to ten minutes. Ms. Wembley later described the defendant as not really caring and acting like he had not done anything. She did observe what appeared to be bloodstains on the defendant's clothing.

Memphis Police Officer R.D. Geronimo arrived at the KFC location at 7:05 p.m. Officer Geronimo was greeted by Ms. Wembley. Ms. Wembley directed Officer Geronimo into the restaurant and toward the defendant. Officer Geronimo approached the defendant, who had a forty ounce Colt 45 beer in his left hand. Officer Geronimo observed that the bottle was three-quarters full. The defendant asked Officer Geronimo who he was and then never made further comment to him. It was Officer Geronimo's opinion that the defendant was "slightly intoxicated."

The defendant was taken from the restaurant to the parking lot. Officer Geronimo noticed that the defendant was "swaying a little bit" in his walking. He explained that this was not due to intoxication, but rather "[h]e was swaying because he's got what they call a heavy foot." The officers at the scene investigated via their handheld radios whether there had been any shootings in the area. The dispatcher responded that "the north precinct was working a shooting at a place at Spring Gate . . . ." Officer Geronimo then noticed what appeared to be blood on the defendant's left pant leg. The defendant was handcuffed but not placed in the police cruiser at that time.

Officer Geronimo's supervisor arrived at the scene and the defendant was transported to 201 Poplar, felony response floor. During the trip to 201 Poplar, the defendant never asked for anything, did not make any complaints, did not vomit, nor did he do anything to indicate that he was intoxicated. Upon arrival, Officer Geronimo released the defendant to Sergeant Merritt, the felony response sergeant.

Sergeant Merritt, noticing the odor of alcohol, determined that the defendant would not be interviewed that evening. Rather, the defendant was permitted to sit overnight and sober up before any interview was attempted.

Officer Marcus Berryman, along with Officer Stark, responded to the 911 call from the Spring Gate Nursing Home. Officer Berryman described the scene at the station two nurses' station as "a war zone." "There were several bullet holes in walls. And behind the nurses' station [in a bathroom] is where we found the victim lying. It was extremely bloody." Angela Carroll was deceased at the time of the officers' arrival. Bullet holes were located in the bathroom wall and the exterior of the bathroom wall. Bullet fragments were located on the

bathroom floor, in the hallway outside the bathroom and on a bookshelf. Ricochet marks were observed on the tile floor beside the nurses' station and a bullet hole was observed in a table. A spent bullet was located inside a plastic bag on top of a medicine cart. A bullet fragment was found in the hallway outside room 223. A spent shell casing was found in the hallway just north of room 225. A spent casing was found inside room 225. Officer Berryman described:

> It's the north hallway we came through. The nurses' station was to the east . . . . There was items of evidence located right off the bat. There was bullet holes in the wall. There was shell casings and fragments. This right here is an emergency exit in the east to west wall on the west end of the hallway. There is the emergency exit. And there are resident rooms on the north side here all the way down. There's bullet holes and shell casings, fragments located in this hallway.

Officer Berryman added that there was a bullet hole in the window of room 223. Two people were located in that room in their beds. Another bullet went through the living quarters of room 223 into the bathroom. Officer Berryman reported that there were "ten, S and W 40 [caliber], spent casings. Four bullet slugs, spent. And two bullet fragments seized from [the Spring Gate Nursing Home]."

Officers Berryman and Stark later received notice that the suspect was at the homicide squad's office. They were to retrieve the defendant's clothing. The left pant leg of the defendant's pants and his left white shoe had what appeared to be blood on them. While photographing the defendant and his clothing, Officer Berryman observed that he was "extremely quiet" and "cooperative."

Sergeants Nathan Berryman and Darryl Thomas were assigned to interview the defendant. The defendant was advised of his rights at 11:55 a.m. on March 1, 2002. He neither asked for an attorney nor indicated that he did not want to talk with the officers. Sergeant Berryman stated that the defendant was not intoxicated nor under the influence of alcohol or drugs at the time of the interview. The defendant signed a waiver of rights form. Sergeant Berryman asked the defendant if he could explain what happened at which time "[the defendant] pretty much confessed and told his story."

In his statement, the defendant related that he and Angela Carroll were living at 4865 Hunters Glen. The defendant "got laid off" and Angela "was acting like she didn't want to be with me anymore." He described an incident on January 13, 2002, where he, Angela and her four children went to the Circle K to get some cigarettes. Angela went inside the store and stayed for such a long time that the defendant sent Angela's oldest son into the store to tell her to "hurry up." When the child did not come out of the store, the defendant went into the store, where he witnessed Angela hanging up the telephone. He realized that she had called the police and he stated, "You didn't have to do it like that. You could have just let me went on about my business and you went on about yours." Angela then took her four children and went to the front of the store. The defendant attempted to leave in his car but was stopped by police. He was then

arrested for "no I.D. for domestic violence." The defendant related that he was released on January 15, 2002, and went to his mother's house as Angela Carroll "had a[n] order of protection against [him]." During this time, Angela "moved all of the stuff out of the house, all of the furniture and the stuff - - and stuff that was in my name from Renta [sic] Center." "She brought my clothes to my mom's house." The defendant stated that he asked Angela to return "Renta Center's stuff to them," to which she responded "Fuck Renta Center." She then told the defendant that, although she still wanted to be with him, they were going to have to give the relationship time and work things out.

Angela continued to visit the defendant at his mother's house two or three times a week and the couple would go to a hotel. "[A]ll of a sudden some guy named Kevin started answering her phone when I called." Angela explained that Kevin was her nephew and Angela and the defendant continued to see one another two to three times a week. The defendant confronted Angela again about "Kevin" and Angela stated that she and Kevin were "just friends." On at least one occasion, Kevin stated "She my bitch. She not with you no more." Kevin then warned the defendant to "[s]top calling here before I come over there and blow your ass off." Angela eventually gave the defendant her new address and when Kevin was not around he would visit her there and they would "go to bed."

The day of the shooting, the defendant attempted to telephone Angela Carroll. Kevin answered the phone and stated, "Boy, didn't I tell you to stop calling my woman. You call her again I'm going to come over there on Colby and blow your ass off." Kevin later called the defendant and advised him that "Yeah, boy, I be over here Watkins and Brown. . . . Come over here at Watkins and Brown." Next thing, Kevin was stating that he was outside of the defendant's house. The defendant stated that he was scared and went to Angela Carroll's "job" instead.

At the nursing home, the defendant asked where he could find Angela Carroll. Angela asked him "[w]hat are you doing here?" He responded by pulling out a gun and shooting her. He could not recall how many times he shot her. He ran out of the nursing home and got into a car. He told the driver, Elvis Bowers, to take him to south Memphis. Bowers dropped him off at Taylor and Roanoke, where the defendant threw the gun in a front yard. This gun was never recovered by law enforcement. He continued up South Parkway where he bought a beer and then went into a Kentucky Fried Chicken restaurant.

The defendant told the officers that he had the gun for about a month and that it was a black nine millimeter pistol. The defendant expressed his remorse, stating he was sorry for what he had done and that he loved Angela Carroll very much. He also stated that he felt sorry for her kids. Sergeant Berryman opined that the defendant's remorse was sincere, stating that he "broke down during the interview."

Dr. O'Brian Cleary Smith performed an autopsy on the body of Angela Carroll. As a result of the autopsy, Dr. Smith concluded that Ms. Carroll's death was the result of multiple

gunshot wounds. Dr. Smith's examination revealed five entry wounds and five exit wounds. He concluded that the five entry wounds could have been caused by four or five gunshots. Both a drug and alcohol screen of Angela Carroll's body were negative.

Qadriyyah Debnam, a special agent forensic scientist with the Tennessee Bureau of Investigation Crime Laboratory, testified that Special Agent Donna Nelson performed an analysis on the defendant's clothing and shoes to determine whether it matched the victim's blood. Agent Debnam performed the control check review on Agent Nelson's work in this case. The blood on the defendant's pants and left shoe matched the blood of the victim.

Johnny Montgomery, a lifelong acquaintance of the defendant, testified that he observed the defendant around three o'clock on the afternoon of February 28, 2002, walking down the street with a "quart of malt liquor." The defendant approached Montgomery and asked him if he could take him to his "girlfriend's job to get some money and he was going to pay me ten dollars." Montgomery testified that he attempted to give the defendant a ride but his car would not make it. The defendant was mad that Montgomery could not take him. Montgomery stated that it was not usual for the defendant to drink and that, on this date, the defendant appeared "[r]eal drunk."

Based upon this proof, the jury returned a verdict finding the defendant, Franklin Fitch, guilty of first degree premeditated murder.

## Penalty Phase

During the penalty phase, the state presented the testimony of Norma Henry, an employee of the Criminal Court Clerk's Office. Ms. Henry explained that she was "keeper of the records" in division one. Through Ms. Henry, the state introduced a certified judgment of conviction against the defendant in case 91-07341 for reckless endangerment with a deadly weapon. The defendant's guilty plea for that offense was entered on November 5, 1991.

Christine Deener, the sister of Angela Carroll, testified that her sister had four children. At the time of the trial, Angela's children were thirteen, twelve, ten and eight. Mrs. Deener described her sister as a "caring person." Angela loved everyone. "She loved God, her family, her children and her church family." "She loved her job."

Angela, only 31 years old when she died, was one of twelve brothers and sisters. Several of her family members have had counseling since her death. Her mother has a hard time dealing with Fridays because Angela was murdered on a Friday. Their father died about ten months after her murder because he "just gave up." Angela's boys have been to bereavement camp. The middle child, Courtney, had to seek counseling at school when a fellow student brought up his mother's death at school. The boys have separation anxiety.

Since her sister's death, Mrs. Deener and her husband have custody of the four boys. As their own children were grown, having custody of Angela's children has greatly impacted their lives. Mrs. Deener had recently retired from her job because it was getting difficult to keep up with four boys in addition to a job. Mrs. Deener related that the youngest child is "challenged" and requires a lot of care. One of Mrs. Deener's sisters helps out with the care of this child.

For mitigation proof, the defendant presented the testimony of three witnesses. Raymond Spencer, a postal carrier with the United States Postal Service, has known the defendant's family for many years. As a teenager, the defendant worked for Mr. Spencer for a while in a grocery store he owned in the New Chicago neighborhood.

Wylene Sutton testified that she met the defendant six years ago when she began dating his brother, Tony. She related that there were six children in the Fitch family. One brother has died since the defendant has been in custody. Their father had passed away prior to Ms. Sutton's relationship with Tony. Their mother passed away in December 2002.

Ms. Sutton related that the defendant had been employed by a roofing company, but he was laid off shortly before Ms. Carroll's death. Ms. Sutton and Tony have visited the defendant at least two times a month and leave money for him. She stated that they would continue to visit the defendant in prison should he receive a life sentence. She stated that a sentence of death would be devastating to the surviving siblings. Ms. Sutton further related that the defendant has a seventeen-year-old daughter and one grandson.

Tony Bouie, the defendant's brother, explained that their father's last name was Bouie and their mother's last name was Fitch. Mr. Bouie described their childhood as "okay" and "very good," but questioned their parents' activities which included "bootlegging and gambling and stuff like that." Mr. Bouie blamed the "bootlegging" on his brother's drinking. He stated that the defendant got into their mother's whiskey every morning before school. Mr. Bouie further explained that their father ran a "crap house." Their father passed away in 1979 from heart failure.

Tony Bouie stated that their mother passed in December 2002. The defendant was close to his mother, a "mama's boy." He checked on his mother daily and really got attached to her when her diabetes worsened. Mr. Bouie stated that the defendant was the third child and the first son. He stated that his brother has already been given a sentence of death, because at the age of forty-three he will never make it out of prison alive. He asked the jurors not to take "all my family members."

Tony Bouie stated that their sister Jackie was an alcoholic, but has not drank in about fifteen years. Their sister "Nackwalyn" is a drug addict. He stated that he had an aunt that had served some time for murder. He added that he and his sisters had served jail time on various charges as well.

Per stipulation by the state, the defendant offered into evidence a discharge summary from Middle Tennessee Mental Health Institute and a summary of his medical charges by Correctional Medical Services Incorporated since his confinement in October 2002. The report from Middle Tennessee Mental Health Institute indicated that during his mental evaluation, the defendant complained of hearing voices. He reported hearing voices since 1989. One voice tells him to kill anybody. The statements made by the defendant during his intake are contrary to his confession to the police. He stated that he does not have a gun. The evaluation process also indicated that the defendant did not know the month or year. Although the defendant stated he was depressed, he denied suicidal ideation or plans. He did however report homicidal feelings toward people who talk about him and a jail guard who told him to straighten his bed. The defendant reported heavy alcohol and drug problems, including drinking a couple pints of hard liquor and two to three six packs of beer per day. He stated he used $100 worth of crack and $10 worth of marijuana a day. The report indicated that the defendant was malingering. The report concluded that the defendant was competent to stand trial and did not meet the criteria for an insanity defense.

The jury retired to deliberate at 11:53 a.m. Deliberations ceased for a lunch break. At 3:20 p.m., the jury returned to open court with its verdict. The jury found that the proof established the aggravating circumstances that the defendant had previously been convicted of a felony involving violence to the person and the defendant knowingly created a great risk of death to two or more persons other than the victim during the act of murder. The jury determined that the statutory aggravating circumstances outweighed any mitigating factors and, therefore, imposed a sentence of death.

## I. Motion to Suppress

The defendant complains that the trial court erred in denying his motion to suppress. The motion to suppress filed prior to trial by the defendant raised the following challenges to the admission of any statements and any physical evidence obtained from the defendant:

1. The defendant did not knowingly, voluntarily and intelligently waive his rights prior to making any statement.
2. Law enforcement authorities failed to provide the defendant with an attorney despite his request for counsel.
3. The defendant was threatened and not permitted to use the restroom or make a telephone call.
4. The defendant was physically detained in an interrogation room until he provided a statement to authorities.

We note, the defendant fails to support his meager argument with any citation to legal authority. *See* Tenn. R. App. P. 27(h).

The trial court conducted a hearing on the defendant's motion to suppress on March 21, 2003. At the hearing, the state first presented the testimony of Memphis Police Officer Jimmy Moore. Officer Moore testified that, on February 28, 2002, he received a call to go to the Kentucky Fried Chicken restaurant located on the 700 block of South Parkway. Upon arriving at the scene, Officer Moore was directed to the defendant by the manager of the restaurant. At this time, Officer Moore observed "a 40-ounce beer bottle on the table beside [the defendant]." The defendant failed to respond to the officer's questions as to "what was going on." Officer Moore and a fellow officer handcuffed the defendant and walked him out to the patrol car. At this time, Officer Moore noticed what appeared to be "three to four blood droplets on his left pants leg." Officer Moore inquired as to whether the defendant had an injury. Again, the defendant failed to respond. The officers lifted up the defendant's pant leg to determine if he had any injury. The officers proceeded to check his right leg, his arms, and his torso and could not locate the source of the blood.

Officer Moore related that the restaurant manager indicated that the defendant had stated that he had shot someone on Spring Gate. Officer Moore then checked with dispatch as to whether there had been any reported shootings that evening. The dispatcher responded that there had been a homicide at the Spring Gate nursing home. The defendant never made any comments in Officer Moore's presence or in the presence of the accompanying officer. The officers were then advised to transport the defendant to the homicide office at 201 Poplar. The accompanying officer, Officer Geronimo, transported the defendant in his patrol unit.

Officer Moore testified that "[the defendant] had an odor of alcohol about his person." He stated, however, that he did not observe the defendant "long enough to determine whether he was intoxicated or not."

On cross-examination, Officer Moore related that the defendant was initially detained with handcuffs as a result of the original disturbance call, the defendant's refusal to answer their questions, the odor of alcohol upon the defendant's person, and the defendant's balance and impaired coordination. The detention was made in order to provide the officers the opportunity to follow-up the investigation with the manager, the original complainant. Officer Moore admitted, however, that, upon their arrival at the location, the defendant was sitting at a table and did not appear to be causing any type of disturbance. Officer Moore further acknowledged that he did not Mirandize the defendant, nor did anyone in his presence. On re-direct, Officer Moore confirmed that the defendant refused to answer the officers' questions and refused to provide any form of identification.

Sergeant Nathan Berryman testified that he and Sergeant Darrell Thompson first encountered the defendant on March 1, 2002. Prior to speaking with the defendant, Sergeant Berryman provided the defendant with his Miranda rights. The defendant indicated that he could read and write the English language. The defendant signed the waiver of rights form at 10:55 a.m. Sergeant Berryman stated that no threats or coercion was employed to effectuate the defendant's waiver of rights. He added that no promises of leniency were made to the defendant.

Sergeant Berryman stated that the defendant never asked for an attorney nor did he ask for any food. The defendant was advised that he could request counsel and/or stop talking during any part of the interview. Sergeant Berryman explained that had the defendant requested counsel, the interview would have been terminated and the case coordinator would be informed that he asked for counsel. He also confirmed that had the defendant been under the influence of an intoxicant the officers would not have proceeded to take a statement from him. It was the opinion of Sergeant Berryman as a law enforcement officer that the defendant was not under the influence of an intoxicant at the time of his waiver and subsequent statement.

Sergeant Berryman continued that, after the defendant executed the waiver of rights form, he provided the officers with a statement regarding the events of February 28, 2002. The statement was dated March 1, 2002, at 1:20 p.m. During his interview, the defendant stated that he had a tenth grade education.

Sergeant Berryman explained that, after the interview, "the secretary types up the statement" and a copy is provided to the defendant. The defendant is permitted to read the copy and correct any errors. The defendant then initials the advice of rights and the statement. In reviewing the copy of his statement, the defendant made one correction, his age. The length of the interview was approximately two hours and twenty-five minutes. Sergeant Berryman described the process:

> Well, me and Sergeant Thompson, which is normal protocol, we go in there. The waiver of rights is signed. Of course a lot earlier than the statement is actually taken is called an interview. We sit there and we talk to him. During that interview, we offer him if he wants to smoke, we offer him something to drink or eat, and we just talked and get the details of what he is telling us. And then we go outside and relay that information to the case coordinator. And then at one point in time it is determined that the interview is over, and we explain to him and they still can tell us no. We say we would like to take a type-written statement from you right now and it will be basically the same thing that we just talked about, the questions will be pretty much the same except a typist will be there typing it up. And then we get a typist. We remove him from the big interview room. We go to either one or two rooms across the hallway where the typist types up the statement.
>
> . . . .
>
> Well, when we go in there initially, we ask them if they're okay, if they need anything to eat or drink. Without the supplement that Thompson did, I wouldn't know the exact times but he did ask for water and was taken to the bathroom, smoked.

-11-

Indeed, the supplement to the interview indicated that the defendant smoked two cigarettes and was given two glasses of water during the interview process. He asked and was taken to the bathroom at 11:50 a.m. The defendant never asked for food during the interview. Sergeant Berryman reiterated that the defendant's statement was "a hundred percent freely and voluntarily [given]."

On cross-examination, Sergeant Berryman stated that between the hour of 9:50 a.m. and 10:55 a.m., the defendant was most likely handcuffed to a chair in the interview room by himself. Sergeant Berryman did not know whether the defendant had been able to shower that morning or whether he had been able to brush his teeth. Sergeant Berryman stated that the defendant did not appear to have a hangover. The defendant did inform Sergeant Berryman that "him and the female had been dating. . . ." Sergeant Berryman stated that the defendant was "very emotional, upset." He added that the defendant was "crying" during some parts of the interview and that he "appeared fairly remorseful and indicated that he loved her."

Clara Benson testified that, on March 1, 2002, she was working at the police department as a transcriptionist in the homicide office. Ms. Benson transcribed the defendant's statement. She related that the typical procedure was for the person who was talking to sit right beside her so they can see her computer screen. She will then type as they speak. Ms. Benson stated that, while the defendant was providing the statement before her, there were no threats or inducements made by police officers to the defendant. She added that at no time did the defendant ask for counsel.

During the transcription process, Ms. Benson related that, while Sergeants Berryman and Thompson were outside the room, the defendant told her that "she didn't want him anymore and she was – had other mens calling her on the phone." Ms. Benson responded, "well that gave you a right to kill her?" The defendant did not answer this question. Ms. Benson stated that the defendant did not appear to be under the influence of an intoxicant.

The defendant testified on his own behalf. He stated that he did not recall providing the statement introduced by the prosecution. He added that he did not recall signing the last page. The defendant admitted that the signature on the statement was his, although "[i]t's messy. I write better than that." He also could not recall the interview with Sergeants Berryman and Thompson nor could he recall the circumstances surrounding his arrest. Similarly, the defendant could not recall making a request for an attorney nor could he recall being in the jail. He stated "I remember waking up, coming through, and that's all I remember. And they told me to sign these papers and you can go home." He concluded by admitting that he had a lot to drink the day prior to his statement.

On cross-examination, the defendant indicated that his memory of events ended on February 27, 2002, when he started drinking. He stated that on February 27, 2002, he drank "up to about nine, eight or nine 40-ounces of Schlitz Bull. . . . [and] [t]wo pints [cognac]." He maintained that he never passed out, but continued drinking on February 28, 2002. He could not

recall what he had to drink on February 28, 2002. The defendant maintained that he did not know where he was on February 28, 2002, and did not know how he got to Spring Gate Nursing Home. He did not recall being at the Spring Gate Nursing Home and he did not know how he got to the Kentucky Fried Chicken restaurant where he was ultimately arrested. The defendant essentially maintained that he was so drunk that he could not recall any of the events of February 28 and March 1, 2002.

Based upon this evidence, the trial court made the following findings of fact and conclusions of law:

> I find the testimony that was presented by the State to be credible. The most telling information that I would say in light of Mr. Fitch's testimony would be the very lengthy and detailed statement given by him, a five-page statement. At least two of those pages appear to the Court to be narratives. . . .
>
> It would appear to the Court that Mr. Fitch was at least aware of his surroundings, aware of the circumstances, able to answer questions, able to provide information, able to provide detailed information. And based on the testimony that the Court has heard from the officers, I don't find any violation of Mr. Fitch's rights. I don't find that he was threatened or coerced or intimidated or promised anything. There has been nothing to contradict what the officers testified to.
>
> I find that Mr. Fitch, it would appear to the Court based on the nature of the statement taken, was not under the influence or if he was under the influence, he was not under the influence such that it would impact his ability to listen and understand his rights and to waive those rights and to give a very detailed statement.
>
> For those reasons, the Court is of the opinion that Mr. Fitch's rights were not violated, that he did give in fact this statement freely and voluntarily fully aware of it and fully knowing what his rights were and what he was entitled to, and that he voluntarily and knowingly waived those rights.
>
> So for those reasons, the Court will deny the motion to suppress.

The issues of whether the defendant was coerced or threatened into providing a statement or whether he gave a voluntary statement are questions of fact. *See* State v. Morris, 24 S.W.3d 788, 805 (Tenn. 2000) (Appendix); State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996);

-13-

Childs v. State, 584 S.W.2d 783, 786-87 (Tenn. 1979). A trial court's findings of fact on a suppression issue are binding upon an appellate court unless the evidence preponderates against those findings. State v. Rogers, 188 S.W.3d 593, 605 (Tenn. 2006); State v. Sawyer, 156 S.W.3d 531, 533 (Tenn. 2005). We, however, review the trial court's conclusions of law de novo. Rogers, 188 S.W.3d at 605.

In Miranda v. Arizona, 384 U.S. 436, 471-75, 86 S. Ct. 1602, 1626-28 (1966), the United States Supreme Court held that a defendant's statements made during a custodial interrogation are inadmissible at trial unless the state establishes that the defendant was informed of his right to remain silent and his right to counsel and that he knowingly and voluntarily waived those rights. Whether the defendant made a voluntary, knowing, and intelligent waiver of those rights depends "'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" Edwards v. Arizona, 451 U.S. 477, 482, 101 S. Ct. 1880, 1884 (1981) (quoting Johnson v. Zerbst, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938)). The waiver must be "'made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" State v. Blackstock, 19 S.W.3d 200, 208 (Tenn. 2000) (quoting State v. Stephenson, 878 S.W.2d 530, 544-45 (Tenn. 1994)). The state has the burden of proving the waiver by a preponderance of the evidence. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997).

In determining the admissibility of a confession, the particular circumstances of each case must be examined as a whole. State v. Berry, 141 S.W.3d 549, 577 (Tenn. 2004) (Appendix); State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996). A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense. Berry, 141 S.W.3d at 577. The primary consideration in determining the admissibility of the evidence is whether the confession is an act of free will. Id. at 577-78 (citing State v. Chandler, 547 S.W.2d 918, 920 (Tenn. 1977)). A confession is not voluntary when "the behavior of the state's law enforcement officials was such as to overbear" the will of an accused and "bring about confessions not freely self-determined." Id. (citing State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980)). In determining whether a defendant validly waived his rights, the court must consider the following factors in determining voluntariness: (1) the defendant's age, education or intelligence level, or previous experience with the judicial system; (2) the repeated and prolonged nature of the interrogation, including the length of detention prior to the confession; (3) the lack of any advice regarding his constitutional rights; (4) the unnecessary delay in bringing the defendant before a magistrate prior to the confession; (5) the defendant's intoxication and ill health at the time the confession was made; (6) the deprivation of food, sleep or medical attention; (7) any physical abuse or threats made to the defendant. *See* State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996).

It appears that the crux of the defendant's argument in support of his position that his waiver of rights and subsequent statement were neither voluntarily nor knowingly given relies upon his alleged intoxicated state at the time. Intoxication is not alone sufficient to bar the introduction of statements made by an accused if evidence also shows that the accused was

-14-

capable of understanding his rights. State v. Bell, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985). Sergeant Berryman related that, in his opinion as a law enforcement officer, the defendant was not intoxicated at the time of his statement. Moreover, the evidence at the suppression hearing revealed that the defendant had been taken into custody at approximately 7:00 p.m. on February 28, 2002. The interview process did not begin until 10:55 a.m. on March 1, 2002. The evidence further reveals that the defendant indicated that he understood his rights and that he signed a rights waiver form. It is clear from the proof presented that the defendant was capable of understanding his rights as an accused. The defendant's repetitive statements of "I don't remember" at the suppression hearing are insufficient to preponderate against the overwhelming proof presented by the prosecution that the law enforcement officers advised the defendant of his rights, that the law enforcement officers did not induce or coerce the defendant into waiving those rights and providing a confession, that the defendant was mentally and physically capable of understanding his rights, and that the defendant knowingly and voluntarily waived his rights. The evidence also supports the trial court's conclusion that "Mr. Fitch . . . was not under the influence or if he was under the influence, he was not under the influence such that it would impact his ability to listen and understand his rights and to waive those rights and to give a very detailed statement." We conclude that the defendant's constitutional rights were not violated. The evidence in the record supports the trial court's findings that the defendant was advised of his Miranda rights, that he waived those rights, and that he gave a voluntary statement. Thus, the statements were properly admitted. The defendant is not entitled to relief on this issue.

## II. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence. Specifically, he asserts that the "dearth of evidence presented at trial that would establish the defendant's *mens rea* would prevent a rational trier of fact from finding him guilty beyond a reasonable doubt of first-degree murder." In support of his argument, the defendant relies upon proof presented in his case-in-chief that suggests that he was in an intoxicated state two to three hours prior to the shooting. He contends that this evidence in connection with evidence that he had obviously been drinking at the time of his apprehension places serious doubt upon whether the intent to kill was formed as a result of a discerning and meditative thought process.

When a challenge is made on appeal to the sufficiency of the convicting evidence, this court is guided by certain well-established principles. First, a jury conviction removes the presumption of innocence with which a defendant is cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. State v. Rice, 184 S.W.3d 646, 661 (Tenn. 2006); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. Rice, 184 S.W.3d at 662; State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Likewise, it is not the duty of this court to revisit questions of witness credibility on appeal, that function being within the province of the trier of fact. *See generally* State v. Adkins, 786 S.W.2d 642, 646 (Tenn. 1990); State v. Burlison, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). Instead, the defendant must establish that the evidence presented at trial was

so deficient that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994), *cert. denied,* 513 U.S. 1086, 115 S. Ct. 743 (1995); Tenn. R. App. P. 13(e). Moreover, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992), *cert. denied,* 507 U.S. 954, 113 S. Ct. 1368 (1993). In State v. Matthews, 805 S.W.2d 776, 779-80 (Tenn. Crim. App. 1990), *perm. app. denied* (Tenn. 1990), this court held these rules applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.

We begin our review by noting that the defendant is mistaken in his reliance upon the presumption that all homicides are presumed to be second degree murder. In State v. Jackson, our supreme court held that "the second degree murder presumption is now obsolete." State v. Jackson, 173 S.W.3d 401, 403 (Tenn. 2005). The state is held, at trial, to the burden of establishing all the elements of the crime beyond a reasonable doubt. First degree premeditated murder is statutorily defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). An act is premeditated if the act is "done after the exercise of reflection and judgment." Id. at (d). In other words, the "intent to kill" must have been formed prior to the act of murder itself. Id. Additionally, it is not necessary that the purpose to kill pre-exist in the mind of the accused for a definite period of time, however, the trier of fact must be satisfied that the accused was sufficiently free from excitement and passion as to be capable of premeditation. Id.

The element of premeditation is a factual question to be determined by the trier of fact with consideration of all the circumstances surrounding the killing. Jackson, 173 S.W.3d at 408 (citing State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003)). Because the trier of fact cannot speculate as to what was in the killer's mind, the existence of facts of premeditation must be determined from the killer's conduct in light of the surrounding circumstances. *See* Jackson, 173 S.W.3d at 408 (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997), *cert. denied*, 523 U.S. 1083, 118 S. Ct. 1536 (1998)). Our supreme court has identified numerous circumstances that may support a finding of premeditation including but not limited to: declarations by the defendant of the intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing. State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000). In addition to these factors, the establishment of the motive for the killing is yet another factor from which the trier of fact may infer premeditation. State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

In the present case, the proof presented reveals that the defendant and the victim had been involved in a romantic relationship. Approximately one month before the offense, the victim moved out of their shared home. Although, according to the defendant, the victim continued to "see" him several times a week, she also became involved with another man. There is also

indication that the victim had filed for an order of protection against the defendant. On the day of the murder, the defendant paid a friend to drive him to the victim's place of employment. He asked employees of the nursing home where he could locate the victim, identifying himself as her boyfriend. Once he located the victim, he kneeled down, drew his gun and began shooting the unarmed victim. He pursued the wounded victim into a bathroom and, despite her cries for help, continued shooting and shouting, "you dirty bitch, you dirty whore, I told you I was going to get you." The defendant placed the weapon in his belt, walked out of the nursing home, and later walked into a fast food restaurant, declaring that he had just shot somebody. Applying the factors identified by our supreme court, we conclude that there are numerous circumstances from which the jury could conclude that the murder was premeditated. For example, (1) the victim was unarmed, (2) the defendant ambushed the unsuspecting victim at her place of employment, (3) the defendant secured a weapon prior to the murder, (4) the murder weapon was never located because of concealment by the defendant, (5) the defendant fired numerous rounds upon the defenseless victim, and (6) the defendant stated that he told the victim that he was going to "get her." Viewing the evidence and inferences therefrom in a light most favorable to the state, this court concludes there was sufficient evidence to support the jury's finding of premeditation.

Notwithstanding, the defendant argues that the proof of premeditation is lacking in light of the testimony regarding his intoxication at the time of the shooting. Evidence of voluntary intoxication, while not a defense to prosecution for an offense, may be admitted to negate a culpable mental state. *See* Tenn. Code Ann. § 39-11-503(a); State v. Phipps, 883 S.W.2d 138, 148 (Tenn. Crim. App. 1994). The trial court admitted testimony regarding the defendant's alleged use of alcohol prior to and immediately preceding the offense and the court properly instructed the jury that voluntary intoxication could negate the defendant's culpable mental state.

Upon review, we conclude that the defense argument that the defendant lacked the requisite mental state for premeditated murder is not persuasive. The only evidence of intoxication prior to the offense comes from the testimony of Johnny Montgomery. Johnny Montgomery, a lifelong acquaintance of the defendant, testified that he observed the defendant around three o'clock on the afternoon of February 28, 2002, walking down the street with a "quart of malt liquor." Montgomery stated that it was not usual for the defendant to drink and that, on this date, the defendant appeared "[r]eal drunk." The state's eyewitnesses at the scene of the shooting all testified that there was no indication that the defendant was under the influence of an intoxicant. Rather, the eyewitnesses at the nursing home all testified that the defendant appeared "calm" and that he was acting with a purpose. The witnesses who testified that the defendant appeared to have been drinking had only observed the defendant after the shooting occurred and they stated that he was only "slightly intoxicated" and not to the point that he did not know what he was doing. In addition, the defendant confessed responsibility for the victim's death to the police and did not admit to being under the influence of alcohol at the time. Whether premeditation exists is for the jury to decide. *See* State v. Morris, 24 S.W.3d at 796. Having reviewed the entire record, we conclude that a jury could have found the essential elements of premeditation and intent beyond a reasonable doubt. The defendant has not met his burden of

proving the evidence was insufficient to support his conviction for premeditated murder. For the aforementioned reasons, the defendant is not entitled to relief on this issue.

### III. Photographs of Victim

In his next issue, the defendant contends that the trial court erred in permitting introduction of "gruesome photographs" of the victim where the probative value of the photographs failed to substantially outweigh their prejudicial effect. During trial, the defendant objected to exhibits 13, 15 and 16. Additionally, he objected to exhibits 47, 48, 49, 50, 51 and 52. Exhibit number 13 depicts a corner of the room in which the victim's body was found. The floor is especially bloody and blood drippings are evident on the walls. This photograph shows an "E," marking a bullet fragment on the floor. Exhibit 15 depicts the head and upper torso of the deceased victim in a prone position on the floor in the room in which her body was found. The victim has a large quantity of blood on her clothing and on her face. This photograph indicates the presence of two spent shell casings, items two and three, on the floor near the victim's body. Exhibit 16 reflects the lower portion of the victim's torso as found after the shooting. The victim's pants are especially bloody as is the surrounding floor. This photograph also indicates the presence of another shell casing, item four, near the victim's torso.

In moving for admission of these photographs, the state argued that each photograph "shows a different piece of evidence that was collected at that scene by the officer." In other words, the photographs were shown to establish that the defendant fired upon the victim numerous times. The state further argued that "[a]ll homicide cases will involve blood. And to try to try a homicide case without showing any blood would be a farce." In ruling on the admissibility of these photographs, the trial court made the following findings:

> I will find that in looking at the photograph marking a bullet fragment E, a photograph . . . that contains items two and three, which appear to be spent shell casing[s], and a photograph that shows item four which appears to be a spent shell casing would go to the idea of premeditation and an intentional killing. And I think the state has a burden of proving that. And I think that at least from a theory of multiple shots being fired. And I'm going to assume there's going to be testimony as to the size of this bathroom area. Within a small confined place would go toward that. And I believe the state would be entitled to show that.
>
> I think for that reason and I'm looking at the issue in the case where there's no contest of the actual killing, only the mental state of the defendant, which appears to be the defense in the case, the court feels the state's entitled to put its best case forward with regard to proving premeditation. . . .
>
> . . . .

-18-

I feel that the probative value of the photographs substantially outweigh any prejudicial effect o[n] the defendant in light of the state's burden of proof. I will admonish the jury that the photographs are not to be used for any type of emotional – or allow the graphic nature of the photographs, the emotional state of that to impact or affect their verdict. That they're only being allowed to be introduced for purposes of demonstrating the items that were found there.

Exhibits 47 through 52 depict post-mortem autopsy photographs of the victim. Exhibit 47 is a facial photograph of the victim, depicting a bullet wound at the base of the victim's neck. Exhibit 48 is the same photograph as Exhibit 47 except that it is a closer range shot of the bullet wound. Exhibit 49 is a photograph depicting three wounds to the victim's back. Exhibit 50 is a photograph of the victim laying prone on her stomach, depicting three bullet wounds to the left side of her back. Exhibit 51 is another view of the victim's back, depicting five bullet wounds. Exhibit 52 is a photograph of the victim laying prone on her stomach, depicting four wounds to the right side of her back. Regarding introduction of these photographs, the trial court made the following findings:

I have first a photograph, a facial photograph that shows . . . would be to show the face. But at the bottom of the photograph, apparently, there's an injury. I don't see any problem with that photograph at all.

The next one is a photograph that's labeled with an A which appears to be a – I don't know if it's an entry or exit wound . . . right below the chin. For the record . . . the wounds have been cleaned. There is no excessive blood. There is no graphic display of injuries. It's simply a close-up photograph with the medical examiner's . . . tape. . . .

There's another photograph that is just a close-up photograph . . . . it just shows wounds B and C as labeled. . . . [T]he wounds are all cleaned. There's no blood. . . .

The next photograph appears to show the victim face down with several more injuries to the left side. Again, there's no blood. The wounds have been cleaned. . . .

The next photograph is again a photograph of the victim faced down. With what appears to be three or four separate gunshot wounds to the right side. Again, the wounds have all been cleaned. There is no excessive blood. There is some blood shown . . . on the lab table . . . but not an excessive amount. And is not displayed in a gruesome or gory fashion.

The final photograph is a photograph of the victim's back with several gunshot wounds. Again, the wounds have been cleaned. The body has been

cleaned. There is a minimal amount of blood shown on the table. All of these photographs, in the court's opinion, are not gory. They are not gruesome. They are not, in my opinion, inflammatory. And as to the location and the nature of the wounds, it would be the court's opinion, that they would be beneficial to the medical examiner in describing the location of the wounds, the nature of entrance and exit wounds. . . . And I find that they are not inflammatory. I do not find they would be prejudicial. I do not find that any prejudice that may be there from the nature of the photographs does not substantially outweigh any probative value. And I do see probative value in light of the fact that the state has got to prove premeditation. . . .

The admission of photographs is generally discretionary with the trial court and absent an abuse of that discretion, will not result in the grant of a new trial. *See* State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). However, a photograph must be relevant to an issue that the jury must decide before it may be admitted into evidence. *See* State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998), *cert. denied*, 526 U.S. 1071, 119 S. Ct. 1467 (1999); State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993); *see also* Tenn. R. Evid. 401, 402. Photographs of a corpse are admissible in murder prosecutions if they are relevant to the issues at trial, notwithstanding their gruesome and horrifying character. *See* Banks, 564 S.W.2d at 950-51.

Notwithstanding this broad interpretation of admissibility, evidence that is not relevant to prove some part of the prosecution's case should not be admitted solely to inflame the jury and prejudice the defendant. *See* id. Additionally, the probative value of the photograph must outweigh any unfair prejudicial effect that it may have upon the trier of fact. *See* Vann, 976 S.W.2d at 102-03; *see also* Tenn. R. Evid. 403 ("[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice"). In this respect, photographs of murder victims are prejudicial by their very nature. However, prejudicial evidence is not excludable *per se*. If this were true, all evidence of a crime would be excluded at trial. Rather, what is excluded is evidence which is unfairly prejudicial, in other words, evidence which has an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one. *See* Banks, 564 S.W.2d at 951.

On appeal, the defendant argues that the state had available other evidence in the form of a crime scene sketch that adequately described the locations of the bullet casings and bullet holes in the area where the victim's body was found. The defendant asserts that the trial court erred by failing to consider this proof when ruling on the admissibility of exhibits 13, 15 and 16. The defendant contends that these photographs appealed to the emotion of the jury rather than its reason. Thus, the prejudicial impact outweighed any probative value. He argues that the trial court's failure to properly administer the balancing test adversely affected his constitutional rights under both the United States and Tennessee Constitutions. The state properly points out that the defendant has waived any challenge to the admissibility of exhibits 13, 15 and 16 by failing to preserve the issue in his motion for new trial. *See* Tenn. R. App. P. 36(a). The defendant responds by asserting that this court should review under plain error. *See* Tenn. R.

Crim. P. 52(b). We decline plain error review. Moreover, notwithstanding waiver on appeal, we cannot conclude that the trial court abused its discretion in admitting these photographs. Accordingly, the defendant is not entitled to relief as to this claim.

The defendant fails to provide any specific argument related to his challenge to exhibits 47 through 52. *See* Tenn. R. App. P. 27. Notwithstanding, the trial court ultimately determined that the photographs were relevant and not prejudicial. In this case, the state was required to prove that the killing was intentional and premeditated. *See* Tenn. Code Ann. § 39-13-202(a)(1). The photographs were relevant to supplement the testimony of the medical examiner. *See* State v. Cole, 155 S.W.3d 885, 913 (Tenn. 2005) (Appendix), *cert. denied,* --- U.S. ---, 126 S. Ct. 47 (2005). Additionally, as noted by the trial court, the photographs are not particularly gruesome. We conclude that the probative value of the photographs is not outweighed by their prejudicial effect, and the trial court did not abuse its discretion in allowing their admission. Further, it does not affirmatively appear that the "admission of the photographs has affected the results of the trial." *See* Banks, 564 S.W.2d at 953. The defendant is not entitled to relief on this issue.

## IV. Instruction on Premeditation

At the conclusion of the proof, the defendant requested that the trial court include that "more than a split second intention to kill is required to constitute premeditation." The defendant acknowledged that the pattern instruction did not include such language, rather his request was based upon State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). The trial court remarked, "Why would I put in there that more than a split second is involved when there is nothing that indicates that that's not the case already?" The trial court concluded that "I'm satisfied that the definition that the committee on pattern jury instructions for the Tennessee Judicial Conference has drafted and drawn. It stood the test of time and this definition is appropriate and I don't see any reason to change it. I think what it says covers what you're asking. So, I'll leave the standard one that we've already done." The trial court then provided the jury with the following instruction regarding premeditation:

> A premeditated act is one done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time he allegedly decided to kill must be carefully considered in order to determine whether the accused was reasonably free from excitement and passion as to be capable of premeditation. . . .

The defendant now contends that the refusal to include the "more than a split second" language was error which violated his rights to a fair trial.

-21-

The instruction on premeditation which the trial court gave to the jury was virtually verbatim with the premeditation instruction set out in Tennessee Pattern Instructions--Criminal 7.01(b) (6th ed. 2001), the pattern jury instruction for first degree murder (premeditated killing). The defendant had a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). So long as the instructions are correct statements of the law and "fully and fairly set forth the applicable law," the trial court does not commit error in "refus[ing] to give a special instruction requested by a party." State v. Bohanan, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987), *perm. app. denied* (Tenn. 1988). In assessing the defendant's claim as to the instructions given by the court, we must review "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987). Based upon our review, we conclude the pattern jury instruction given by the trial court was accurate and sufficiently instructed the jury as to premeditation so that no additional instruction was necessary. This being the case, it was not error to refuse to submit the special instructions requested by the defendant.

## V. Improper Closing Argument

Next, the defendant complains that the prosecution made "certain misstatements of evidence, inflammatory arguments and impermissible statements at trial without [the trial court giving] corrective instructions or declaring a mistrial." The defendant asserts that, "[c]ollectively, these improper arguments satisfy all of the requirements for plain error." He specifically finds fault with the following statements made during closing argument:

1. General Coffee's statement: "Mr. Nance said, well, Mr. Coffee didn't tell you about all that statement. I don't present stuff to a jury that I don't believe is true." This statement was made in response to the defendant's argument that the police failed to ask the defendant whether he was intoxicated. He contends that General Coffee's remark implies that defense counsel would present untruthful information to the jury.

2. General Coffee's statement: "I have an absolutely ethical obligation as a prosecutor. I can't hide facts. . . . Every piece of evidence we have as prosecutors, Ms. McEndree and I, we are absolutely ethically obligated to give it to the defense. We gave Mr. Nance everything we had. Including two videotapes. The defendant complains that this statement further implies that defense counsel would present untruthful evidence to the jury.

The defendant further complains that the prosecution took "creative license" with some of the evidence introduced at trial. Specifically, the prosecution made the following statements that were contrary to the evidence:

1. "He intentionally took that gun to her house."

2. "Everybody should be able to live free from being tortured."

-22-

3. "[Johnny Montgomery] told you that Mr. Fitch gave him directions as to how to take him to where his wife was."

4. "This woman was struck all over her body by gunshot wounds including one that Dr. Smith told you she would either have to be on her back when she was shot; she would have to be kneeling at an angle when she was shot, or the defendant would have to be standing over her and firing down into her chest when she was shot."

5. "Angela Carroll announced to the world I don't want to be with Franklin Fitch anymore. Please come and arrest this man. I don't want him beating on me. Put him in jail. I need a protective order. Please help me protect myself. She did everything that she could do to keep him away, to keep this man away from her."

He contends that the proof introduced at trial contradicts these assertions. The defendant also complains that "[t]he state also testified as to factual examples of the various forms of homicide in an effort to convince the jury that facts which don't fit the stated examples could not constitute those lesser included offenses." He contends that the failure of the trial court to provide a curative instruction constitutes an abuse of discretion and plain error.

At the conclusion of the prosecution's argument, the defendant entered an objection as to the "factual examples of the various forms of homicide." The trial court then provided the jurors with the following curative instruction:

> [T]he different degrees of homicide that Mr. Coffee discussed with you . . ., those examples are not the only types of homicides that can fit that category. Second-degree murder, voluntary manslaughter, reckless and criminally negligent. There could be a myriad of those. Those are question of fact for a jury to determine when they hear the testimony of a particular trial. So, not to have any confusion, the examples he used were simply examples. Those aren't all the different types, factually, that would meet that criteria. All right.

The defense also objected to statements made by the prosecutor regarding the videotapes. The trial court determined that the proof at trial demonstrated that the videotapes were blank.

In response to this litany of alleged improper argument, the state asserts that the defendant failed to object to any of the allegedly inappropriate statements and/or challenge the statements in his motion for new trial. Ordinarily, absent a contemporaneous objection and preservation in the motion for new trial, the issue would be waived. *See* Tenn. R. App. P. 36(a); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992). However, it appears that the defendant expects this court to address the alleged misconduct as plain error. We note that the defendant has, again, failed to support his argument with any citation to authority. *See* Tenn. R. App. P. 27(h).

Rule 52(b) of the Tennessee Rules of Criminal Procedure provides that this court may address "[a]n error which has affected the substantial rights of an accused . . . at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." When determining whether an error constitutes plain error, the following factors should be considered:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused did not waive the issue for tactical reasons; and
(e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also* State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000) (adopting the Adkisson test for determining plain error). The presence of all five factors must be established, and consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. Smith, 24 S.W.3d at 283. Moreover, the error "'must be of such a great magnitude that it probably changed the outcome of the trial.'" Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

Upon review of the record, we conclude that the alleged misconduct did not affect the outcome of the defendant's trial. It is well-established that closing argument is a valuable tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (Appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996) (citing State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978)). The following factors must be considered in making this determination:

(1) The conduct complained of viewed in context and in light of the facts and circumstances of the case.
(2) The curative measures undertaken by the court and the prosecution.
(3) The intent of the prosecution in making the improper statement.
(4) The cumulative effect of the improper conduct and any other errors in the record.
(5) The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); *see also* State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984).

Upon review of the record, we conclude that none of the challenged statements affected the outcome of the defendant's trial. Following the arguments of counsel, the trial court properly instructed the jury regarding their duty as the judges of fact and law, the presumption of innocence, and the state's burden of proof. The trial court also instructed the jury that the "[s]tatements, arguments and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them." In light of these instructions and the overwhelming evidence of guilt, we conclude that the prosecutor's remarks did not constitute plain error. This issue is without merit.

## VI. Sufficiency of the (i)(2) Aggravator

The defendant maintains that the evidence was insufficient to establish the (i)(2) aggravating circumstance, that he had been previously convicted of a crime whose statutory elements involved violence to the person. In support of his argument, the defendant maintains that "[r]eckless endangerment is not an offense whose elements involve violence to the person." While the state asserts that the offense of reckless endangerment may constitute an offense whose statutory elements involve the use of violence to a person, see Cole, 155 S.W.3d at 885, the state concedes that the proof in the present case is insufficient evidence from which the trial court could make that determination.

Prior to the penalty phase, a hearing was held to determine whether the defendant's conviction for reckless endangerment qualified as a "prior violent felony." In this regard, the trial court made the following statements:

> And in looking at the charge reckless endangerment, which I believe is what Mr. Fitch pled guilty to, the elements of reckless endangerment are that the defendant engaged in conduct which placed or might have placed another person in imminent danger of death or serious bodily injury and that the defendant acted recklessly and that the offense was committed with a deadly weapon.
>
> In light of this case the court would find that reckless endangerment with a deadly weapon does not necessarily, on its face, involve the use of violence. And the procedure, as I understand it from the case of State v. Sims, is that out of the presence of the jury the court is to determine based upon proof presented by the district attorneys' office as to the underlying facts of the particular case. At that point, then the court would be charged with determining whether or not reckless endangerment with a deadly weapon based upon those facts would constitute a crime involving use of violence to the person. And that I'm to make that determination prior to any presentation to the jury.

So the first thing I think we need to do was accomplish that. . . . But I think first we would need to establish for the record the underlining facts so that I can make a determination as to the  --  in compliance with State v. Sims as to whether or not that particular statute would be considered as a crime involving use of violence.

The prosecution then announced that "the state would propose to present proof of that crime by a certified copy of the affidavit of complaint that was sworn out by the victim in this offense of Charlene Warner at the time that she was assaulted by the defendant and a certified copy of the judgment indicating Mr. Fitch was convicted of that offense of reckless endangerment, sentenced to two years confinement in the Shelby County Correctional Center." The prosecution stated that the victim of the prior offense died on July 4, 1995. The affidavit of complaint, pertaining to the defendant's prior conviction which is at issue here, states as follows:

> On Wednesday, 4/3/91, [at] approximately 3:15 p.m., while the affiant was standing at the bus stop in the 1400 block of Faxon she was approached by her ex-boyfriend, FRANKLIN FITCH, who struck her in the face with his hand. FITCH then picked up a 2X4 board and struck the affiant in the head, right side, approximately 10 times. The affiant also was struck on the left arm several times with the 2X4 board. The affiant did receive a broken wrist and several large lacerations to the head from the beating. The affiant was taken to the MED by Fire Department Ambulance where she was treated and released. FITCH became angry with the affiant after she had put him out of her house the previous day. THIS INCIDENT OCCURRED IN MEMPHIS, SHELBY COUNTY, TENNESSEE.

In April 2001, our supreme court filed its opinion in State v. Sims, 45 S.W.3d 1 (Tenn. 2001). In Sims, regarding the use of the "prior violent felony" aggravating circumstance found in Tennessee Code Annotated section 39-13-204(i)(2), (the (i)(2) factor), the trial court, during a hearing outside the jury's presence, used an affidavit of complaint to review the facts of the defendant's two prior aggravated assault convictions, in order to determine that the defendant had two prior felony convictions involving the use of violence to the person. Sims, 45 S.W.3d at 11. The trial court then allowed the state to present proof of the defendant's two prior convictions for aggravated assault as felonies involving violence to the person. The trial court instructed the jury that those two convictions were for felonies involving violence to the person. Id. Of course, the circumstances in Sims are identical to the circumstances in the case *sub judice*: the prior conviction was for a criminal offense which does not necessarily involve the use of violence to another person. In its holding on this issue, our supreme court clearly put the stamp of approval upon the trial court's use of an affidavit of complaint to determine the underlying facts of a prior felony conviction in order to determine whether it is a conviction involving the use of violence to another person. The court stated "[t]he approach to this issue taken by the trial judge was carefully contemplated and achieved a fair result. The evidence was sufficient to

support the jury's finding of the prior violent felony aggravator. We therefore find no error in its application in this case." Id. at 12.

In the case *sub judice*, the trial judge specifically relied on Sims when it determined, out of the jury's presence and prior to the sentencing hearing, that the state could use the affidavit of complaint to establish that the defendant's prior conviction for reckless endangerment with a deadly weapon involved the use of violence to another person. Therefore, the trial court relied upon what appeared to be settled law when it used the facts contained in the affidavit of complaint during the sentencing hearing in September 2004.

However, subsequent to the sentencing hearing in the case *sub judice*, the United States Supreme Court clarified what can constitutionally be relied upon by a trial court to examine the facts underlying a prior conviction in order to enhance a sentence. Shepard v. United States, 544 U.S. 13 (2005). The Supreme Court affirmed the District Court's refusal to enhance a defendant's sentence by using police reports to establish that a prior conviction was for a "violent felony." The Supreme Court held that a trial court may find "the fact of a prior conviction," but the trial court is limited to "examining the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." Id. 544 U.S. at 16.

Later, in State v. Ivy, 188 S.W.3d 132 (Tenn. 2006), our supreme court held that the limitations in Shepard also must apply to the trial court's determinations under the procedure set forth in Sims. Ivy, at 151. Accordingly, the supreme court held that ". . . an affidavit of complaint, like a police report, is not a judicial record of the kind approved in Shepard. . . . As a result, the trial court should not have considered the affidavit of complaint under Shepard." Ivy, at 152.

On appeal, the state concedes that under Ivy, there was no evidence to determine that the defendant's prior felony conviction involved the use of violence to another person, that the trial court erred in its instruction to the jury, and that it was error for the jury to consider the (i)(2) aggravating circumstance.

Nevertheless, the state argues that the error was harmless beyond a reasonable doubt. In support of this argument, the state asserts that there was overwhelming proof of the sole remaining aggravating circumstance, the (i)(3) factor. This factor requires proof that the defendant knowingly created a great risk of death to two or more individuals, other than the victim, during the first degree murder for which the defendant was being sentenced. The state also asserts that the defendant's mitigation evidence was weak, further supporting a conclusion that use of the (i)(2) aggravating circumstance is harmless error beyond a reasonable doubt.

In reaching the determination of whether use of an invalid aggravating circumstance is harmless error beyond a reasonable doubt, our supreme court has concluded that,

In order to guarantee the precision that individualized sentencing considerations demand and provide a principled explanation for our conclusion in each case, it is important, when conducting harmless error review, to completely examine the record for the presence of factors which potentially influence the sentence ultimately imposed. These include, but are not limited to, the number and strength of remaining valid aggravating circumstances, the prosecutor's argument at sentencing, the evidence admitted to establish the invalid aggravator, and the nature, quality and strength of mitigating evidence.

State v. Howell, 868 S.W.2d 238, 260-61 (Tenn. 1993).

Reviewing the four non-exclusive factors referenced in Howell, we conclude that the number (one) of remaining valid aggravating circumstances does not weigh in favor of harmless error. However, the strength of this factor does weigh in favor of harmless error. The nature, quality and strength of the mitigation evidence is neutral on the issue of harmlessness of the error.

However, the two remaining factors, in the particular circumstances of this case, weigh heavily toward the conclusion that the error was not harmless beyond a reasonable doubt. In particular, the prosecution placed much emphasis on the invalid (i)(2) aggravator in its closing argument.

Excerpts from the state's closing argument during the penalty phase was as follows:

We have also proven to you that the defendant has one prior felony conviction involving violence to a person other than the case in which you found him guilty. You know that on April 3rd, 1991 Mr. Franklin Fitch followed Charlene Warner to a bus stop. You have that affidavit of complaint. That's proof before you. That she had broken up with Mr. Fitch the previous day, had put him out of her house and he became angry. And he followed her to a bus stop and picked up a two by four. After he slapped and struck this woman in her face, picked up a two by four and hit Charlene Warner in the head at least ten times. And that he hit her on her arm several times and that he caused severe lacerations to the head of Charlene Warner requiring her to be hospitalized. Broke her wrist as a result of beating another woman and pummeling another woman with a two by four because she had broken up with him and she had put him out of her house.

And the judge has told you and he will tell you again that you can use the facts of that conviction to determine how much weight you should give that aggravating circumstance that the defendant has previously been convicted of a felony involving violence to a person. And I would suggest to you that you should give that aggravating circumstance tremendous weight. Can you think of anything more horrific? Can you think of any past more horrific? Can you think

of anybody that is more deserving of the death penalty based on a prior conviction of violence? These two separate women, about 12 years apart, that has tried to get away from the defendant; put him out of their house; told him "I don't want you anymore, Franklin Fitch." He took a two by four to one and busted her head open, broke her arm.

\* \* \*

When you look at the statutory aggravating circumstances, we're going to ask you to find beyond a reasonable doubt that he has previously been convicted of a felony involving violence to a person. Specifically a felony reckless endangerment with a deadly weapon. You've seen the affidavit of complaint on that. You'll have that in the jury room if you want to. That's something that really can't legitimately be contested. That is his conviction. That is his history. That is what he has done. And the court will tell you that you can consider the underlying facts to decide how much weight you want to give that aggravating circumstance. And the underlying facts are absolutely unconscionably brutal. And to graduate from beating a woman in the head with a two by four ten times, striking her on her arm several times, beating her in her face, putting a woman in the hospital who has rejected him, to get convicted of that felony offense and to graduate from that to taking a gun. Beating isn't enough. It's not enough for you to take a board and bust somebody's head open. It's not enough for me to take a two by four and maim somebody and put them in the hospital. Let's graduate to just blowing somebody away. Let's take a gun and start killing in public places, work places.

\* \* \*

Has the State of Tennessee proved to you one or more statutory aggravating circumstances beyond a reasonable doubt? Yes, we have. We proved two. And both of them are absolutely horrendous. Both of them are egregious. Can you think of anything more outrageous, more offensive, more ridiculous than folks in our community who can't take care of themselves, being subjected to the terror and the threat of death, the great risk of death that this defendant created on February 28th, 2002 when he went into Spring Gate Nursing Home and shot up that place? Folks that go to work shouldn't have to deal with that. Family members that go visit loved ones who are ill, terminally ill shouldn't have to be exposed to having to duck bullets in this community. Patients who can't take care of themselves should not have to live through the terror and the horror of hearing bullets running through slamming through windows and through walls and not knowing what in the world is going on. Can you think of anything more egregious than what he did on February 28th, 2002? Can you think of a worse felony involving violence to a person than what he did to Charlene Warner on

-29-

April 3rd, 1991?  If you break up with somebody and that person comes to your house and attacks you and bludgeons you with a two by four, can you think of any two worse aggravating circumstances than what you have before you when you're making the decision as to whether or not the State has carried its burden of proof.

The following excerpts are from the state's closing argument which pertained to rebutting the defendant's mitigation evidence:

He was not under the influence of extreme mental or emotional disturbance.  This was a cold, calculated, brutal execution.  This is a person that has a history, has a pattern of when someone tells him I don't want you anymore, go away, he gets mad and he exacts revenge by shooting or beating women.

* * *

The third [mitigating circumstance] says that he lacked the capacity to appreciate that his conduct was wrong because he had a mental disease or he was intoxicated.  You have already rejected his idea that he was intoxicated.  You know he was not intoxicated when he killed Angela Carroll.  Based on his history you know that's what he does.  He was not intoxicated when he killed Angela Carroll.  He was not intoxicated when he beat, pummeled, battered Charlene Warner.  That's what he does when he is rejected.  This is not a question of whether or not he was intoxicated.  It's not a question of whether or not based on his intoxication he didn't appreciate what he was doing.  He knew exactly what he was doing.

* * *

But listen to what they didn't tell you.  Franklin Fitch grew up in a bad background.  A lot of folks grew up in bad backgrounds.  I would submit that probably some of the folks on the jury probably grew up in less than ideal backgrounds.  But it doesn't give you the right to go out and kill and batter and maim folks because your background was less than pristine.  Mr. Bouie told you that they have five other brothers and sisters.  And yeah, they may have some problems with alcohol and drugs, but no, Mr. Coffee, we don't go out and kill people.  We don't take two by fours to folks and break heads and break arms.  We don't do that.  So don't let his less than ideal background think that that's justification for him behaving the way that he has behaved.  Hold him responsible for what he has done.  These are choices that this defendant has made.  He has made these choices.  His background didn't force this man, did not turn this man into a killer.  His background did not turn him into an abuser.  His background did not turn him into a batterer.  His background did not make him grow up to be a

-30-

person who engages in domestic violence and in a continuing theme of escalating domestic violence towards women.

The affidavit of complaint, the very substance of the proof to establish the prior felony conviction as one that involved use of violence against another person, was made an exhibit at the sentencing hearing and published to the jury. The state repeatedly emphasized the underlying facts of the prior conviction, as erroneously established by the affidavit of complaint, during its closing argument. The state argued that the jury should not only use the prior convictions to find an aggravating circumstance beyond a reasonable doubt, but also to rebut the existence, and not just the weight, of mitigating factors.

After reviewing the entire record in the light of Shepard, Ivy, and Howell, we can reach no conclusion other than the error of charging and allowing the jury to consider the (i)(2) aggravating circumstance was not harmless error beyond a reasonable doubt. Accordingly, we conclude that while the conviction of first degree murder should be affirmed, the death sentence must be reversed and the case remanded for a new sentencing hearing. Of course, the state is not precluded from attempting to prove the (i)(2) aggravator at the new hearing as long as the evidence complies with the limitations set forth in Shepard and Ivy.

.

## VII. Instruction that Prior Felony was Offense of Violence Unconstitutional

The defendant complains that the question of whether a prior crime involves violence to the person is a question for the jury to resolve beyond a reasonable doubt and not a question for the judge to determine by a preponderance of the evidence. The defendant, therefore, argues that the trial court's instruction to the jury as to the (i)(2) aggravating circumstance violates his right to a jury determination under the United States Constitution. While this court has already determined that application of the (i)(2) aggravating factor was error, this court finds it prudent to address the merits of this issue.

In support of his argument, the defendant relies, in part, upon the United States Supreme Court's decisions in Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428 (2002). In essence, he asserts that these decisions invalidate the procedure announced by our supreme court in State v. Sims, 45 S.W.3d 1 (Tenn. 2001). Our supreme court has upheld the Sims procedure on numerous occasions, rejecting the argument that Sims is invalid under Apprendi or Ring because the Sixth Amendment requires facts used to enhance a punishment to be found by a jury beyond a reasonable doubt. *See* Ivy, 188 S.W.3d at 150; Cole, 155 S.W.3d at 904; *see also* State v. Powers, 101 S.W.3d 383, 400 (Tenn. 2003). In upholding the Sims procedure, our high court acknowledged that "Apprendi and its progeny preclude judges from finding 'additional facts,' that increase a defendant's sentence beyond the 'statutory maximum,' which is defined as the maximum sentence a judge may impose '*solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*.'" Cole, 155 S.W.3d at 903 (quoting Blakely v. Washington, 542 U.S. 296, 303, 124 S. Ct. 2531, 2537 (2004)). The court differentiated the principles of Apprendi from the Sims

procedure, concluding that "[t]he Sims procedure involves a legal determination, and as such this procedure does not transgress the dictates of Apprendi and its progeny." Id. at 904. In explaining this conclusion, our supreme court stated:

> The (i)(2) aggravating circumstance requires only that the *statutory elements* of the prior felony involve the use of violence to the person. The Sims procedure authorizes trial judges merely to examine the facts, record, and evidence *underlying* the prior conviction to ascertain which "statutory elements" served as the basis of the prior felony conviction. This is a legal determination that neither requires nor allows trial judges to make factual findings as to whether the prior conviction involved violence. This legal determination is analogous to the preliminary questions trial judges often are called upon to decide when determining the admissibility of evidence.

Id. (citation omitted). In this regard, it has been recognized that "certain aspects of the character of prior convictions are so basic as to be implicit in the fact of a prior conviction." United States v. Hollingsworth, 414 F.3d 621, 623 (6th Cir. 2005). "[T]he violent nature of a previous offense 'is not a fact that pertains to the commission of the offense for which the defendant is presently charged,' but rather a fact that pertains to a previous offense." Id. (quoting United States v. Burgin, 388 F.3d 177, 186 (6th Cir. 2004)). Accordingly, the determination of whether a defendant's prior conviction is a crime involving violence to the person is one squarely within the province of the trial court. Thus, even had this court found the (i)(2) factor properly applied, the defendant would not be entitled to relief on this claim.

## VIII. Sufficiency of the (i)(3) Aggravator

The defendant complains that the proof was insufficient to support the jury's finding of the (i)(3) aggravating circumstance that "the defendant knowingly created a great risk of death to two or more persons other than the victim murdered during the act of murder." Specifically, he asserts that "neither the court nor the prosecutor named the two or more persons other than the victim whom the defendant allegedly put at risk." Additionally, he argues that "the jury failed to name which two or more persons were put at risk." The defendant contends that the failure to specifically name the persons placed at risk leads to a less than unanimous verdict violating his constitutional rights. The state asserts that there is no requirement that the jury agree as to the particular facts underlying the aggravator, therefore, the defendant was not denied his constitutional right to a unanimous verdict.

First, we acknowledge that the defendant has failed to support his argument with authority, waiving the issue on appeal. *See* Tenn. R. App. P. 27(h). Next, while a defendant is entitled to a unanimous jury verdict, research reveals no case that requires a unanimous verdict regarding the theory of guilt. *See* State v. Keen, 31 S.W.3d 196, 208 (Tenn. 2000) (stating that "research reveals no case . . . in which we have held that the right to a unanimous jury verdict encompasses the right to have the jury unanimously agree as to the particular theory of guilt

-32-

supporting conviction for a single crime"); State v. Lemacks, 996 S.W.2d 166, 170-71 (Tenn. 1999) (holding in a driving while under the influence case that a general verdict of guilty did not present a unanimity problem even though some evidence indicated that the defendant was driving the car while other evidence indicated that he was criminally responsible for another person driving the car); State v. Cribbs, 967 S.W.2d 773, 787 (Tenn. 1998) (jury finding the defendant guilty of first degree murder raised no verdict unanimity problem even though some jurors may have believed the defendant committed felony murder while others believed he committed premeditated murder). Similarly, research reveals no case that requires a unanimous verdict as to the specific individuals placed at great risk of death by the defendant's act of murder. Accordingly, this claim is without merit.

The uncontested proof at trial revealed that the defendant fired multiple gun shots inside the nursing home where the victim and other health care workers and patients were present. The proof indicated that at the onslaught of the assault, the victim was standing on the opposite side of the nurses' station desk. Two other employees were on the opposite side of the desk and sought cover beneath the desk once the gunfire began. Moreover, station two housed bed-ridden patients. Bullet fragments were found in or near two rooms which housed bed-ridden patients at the time. In total, there were between ten to fifteen people within the defendant's immediate line of fire. Our supreme court has previously held that this aggravating circumstance "contemplates either multiple murders or threats to several persons at or shortly prior to or shortly after an act of murder upon which the prosecution is based." Johnson v. State, 38 S.W.3d 52, 63 (Tenn. 2001) (citing State v. Cone, 665 S.W.2d 87, 95 (Tenn. 1984)). "Most commonly, this aggravating circumstance 'has been applied where a defendant fires multiple gunshots in the course of a robbery or other incident at which persons other than the victim are present.'" Johnson, 38 S.W.3d at 63 (quoting State v. Henderson, 24 S.W.3d 307, 314 (Tenn. 2000)). "In many of the cases upholding application of the (i)(3) aggravator, the defendant fired random shots with others present or nearby, the defendant engaged in a shoot-out with other parties, or the defendant actually shot people in addition to the murder victim." Johnson, 38 S.W.3d at 63 (footnotes omitted). We conclude that the proof was more than sufficient to support application of the (i)(3) factor. The defendant is not entitled to relief on this ground.

## IX. Victim Impact Testimony

The defendant complains that the trial court erred in permitting the presentation of more than a brief glimpse into the life of the victim as victim impact proof. Specifically, he asserts that the trial court permitted the state to introduce evidence that the thirty-one-year-old victim was a caring person who loved everyone including God, her family, her children and church family; and that the victim's father passed away in October following her death because he just gave up and did not want to do anything. The defendant contends that this victim impact testimony failed to contain any relevance to the state's alleged (i)(2) and (i)(3) aggravating circumstances nor to the defendant's mitigating factors.

Prior to the introduction of the victim impact testimony at trial, the state voir dired the witness at the conclusion of which the trial court made the following findings:

> I think that testimony if that's her impression, I think that's something that she can testify to with regard to the father. I think the kind of things that her sister had done in the community and things like that, I'm not sure that that is in compliance with Nesbit. . . . But I think that the purposes, the impact that the law says placed on the family and the members of the family and the community and otherwise. But I think she can testify to all of that.

After further argument by counsel and consideration by the trial court, the trial court admonished the prosecution:

> I would remind you . . . cases which do allow victim impact and the statement also stress very heavily that it's not to be argued and argued dwelt upon in arguments and so forth. That it is strictly allowed for the limited circumstances under which it's been allowed, but that it should not be stressed because it's very clear in all of these cases that the verdict should not be based on emotion. And arguing victim impact issues would definitely get into an emotional state.

Again, the defendant submits that the victim impact evidence presented in the instant case went beyond the impact of the victim's murder on her immediate family. He further argues that the evidence had little, if any, relevance, and that the probative value was outweighed by unfair prejudice. Essentially, the defendant contends that the trial court erred by admitting the victim impact evidence which clearly exceeded the scope of evidence authorized in State v. Nesbit, 978 S.W.2d 872, 889 (Tenn. 1998). The state responds that the victim impact testimony was properly admitted. Specifically, the state contends that statements that the victim was a caring, loving, religious individual are characteristics unique to the victim and provide a glimpse into her life. Similarly, the state asserts that testimony regarding the death of the victim's father shortly after her murder provides insight as to how the victim's murder impacted members of her immediate family.

Neither the United States Constitution nor the Tennessee Constitution prohibit the use of victim impact evidence in a capital sentencing proceeding. State v. McKinney, 74 S.W.3d 291, 308-09 (Tenn. 2002) (citing Payne v. Tennessee, 501 U.S. 808, 827, 111 S. Ct. 2597, 2609 (1991)). However, the introduction of such evidence is not unrestricted. Berry, 141 S.W.3d at 589. "Victim impact evidence may not be introduced if (1) it is so unduly prejudicial that it renders the trial fundamentally unfair, or (2) its probative value is substantially outweighed by its prejudicial impact." Id. (citing Nesbit, 978 S.W.2d at 891). Our supreme court has provided guidance as to the nature and extent of evidence that may be admitted as "victim impact" evidence:

Generally, victim impact evidence should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family.

Nesbit, 978 S.W.2d at 891 (citations and footnote omitted); *see also* State v. Reid, 91 S.W.3d 247, 280 (Tenn. 2002). "[T]here is no bright-line test, and the admissibility of specific types of victim impact evidence must be determined on a case-by-case basis." Nesbit, 978 S.W.2d at 891. However, "such evidence . . . should be closely scrutinized and restrained so as not to be unduly prejudicial or appeal to the emotions or sympathies of the jury." McKinney, 74 S.W.3d at 309.

In the instant case, the testimony of the victim's sister regarding the impact of the murder on the victim's family, specifically her father, was clearly of the nature contemplated by Nesbit. *See* Smith, 993 S.W.2d 6, 17 (Tenn. 1999). The fact that the death of a loved one is devastating requires no proof. Berry, 141 S.W.3d at 590 (citing Morris, 24 S.W.3d at 813). It was within the jury's province whether to believe that the victim's father's death was a direct result of her murder. Moreover, testimony that the victim was a caring and loving individual and that she loved God was proper testimony providing a "brief glimpse" into the life of the victim. The defendant is not entitled to relief as to this issue.

## X. Victim Impact Instruction

Next, the defendant contends that "[t]he victim impact instruction given by the trial judge amounts to an undue intrusion into the exclusive province of the jury." In instructing the jury, the trial court provided the following instruction as to victim impact evidence:

You may consider this victim impact evidence in determining the appropriateness of the death penalty only if you first find the existence of one or more aggravating circumstances has been proven beyond a reasonable doubt by evidence independent from the victim impact evidence and find that the aggravating circumstance or circumstances found outweigh the finding of one or more mitigating circumstances beyond a reasonable doubt.

The defendant contends that "there is a reasonable probability that the instruction coerced a finding by the jury that the aggravating circumstances outweighed the mitigating circumstances because to find otherwise would require the jury to ignore the emotional victim impact evidence presented by the State."

The instruction provided to the jury in the present case was recommended by our supreme court in Nesbit, 978 S.W.2d at 892, and was discussed and approved by our supreme court in Reid, 91 S.W.3d at 283. *See also* State v. Reid, 164 S.W.3d 286, 336-37 (Tenn. 2005) (Appendix); Cole, 155 S.W.3d at 914 (approving Nesbit victim impact instruction). Moreover,

-35-

in Reid, the supreme court specifically noted that any contradiction arising between the instruction and the statute inured to the benefit of the defendant, and, thus, should not entitle a defendant to relief. Reid, 91 S.W.3d at 283. Accordingly, the defendant is not entitled to relief on this issue.

## XI. Failure to Charge Aggravating Circumstances in Indictment Violates Due Process

The defendant asserts that "[a]ny fact that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt in order to satisfy the 5th Amendment's Due Process Clause and the 6th Amendment's notice and jury trial guarantees." With reliance upon Apprendi v. New Jersey and Ring v. Arizona, the defendant submits that he was denied due process of law as the indictment returned by the grand jury did not include facts that would qualify him for the death penalty. In other words, he maintains that first-degree murder is not a capital offense unless accompanied by aggravating factors. In order to elevate the crime to capital murder, he alleges that the indictment must include language of the statutory aggravating circumstance(s).

The Tennessee Supreme Court has consistently rejected this argument by holding that aggravating circumstances need not be pled in the indictment. *See* Reid, 164 S.W.3d at 312; Leach, 148 S.W.3d at 59; Berry, 141 S.W.3d at 562; State v. Holton, 126 S.W.3d 845, 863 (Tenn. 2004); State v. Dellinger, 79 S.W.3d 458, 467 (Tenn. 2002). The state's highest court explained, "[t]he focus in Apprendi, Ring, and Blakely was on the Sixth Amendment right to trial by jury," and "the Court expressly declined to impose the Fifth Amendment right to presentment or grand jury indictment upon the States." Berry, 141 S.W.3d at 560. The defendant is not entitled to relief on this issue.

## XII. Constitutionality of Tennessee's Death Penalty Statutes

The defendant raises numerous challenges to the constitutionality of Tennessee's death penalty provisions. Upon review, we conclude that the defendant's specific complaints have previously been rejected by the courts of this state. As an intermediate appellate court, this court is bound by the prior decisions of the Tennessee Supreme Court rejecting each of the challenges. Notwithstanding, we acknowledge that the defendant must raise these issues to preserve them for review by a higher court. We proceed to briefly address each challenge made by the defendant.

> 1. The defendant asserts that Tennessee's death penalty statutes fail to meaningfully narrow the class of death eligible defendants, thereby rendering the Tennessee death penalty statutory scheme unconstitutional. Specifically, he argues that the statutory aggravating circumstances set forth in Tennessee Code Annotated section 39-13-204(i)(2), (i)(5), (i)(6) and (i)(7) have been so broadly interpreted, whether viewed singularly or collectively, that they fail to provide a "meaningful basis" for narrowing the population of those convicted of first degree murder to those eligible for the sentence of death. None of these factors are applicable to the present case as none of these factors were relied upon by the

state nor found by the jury. Thus, any objection to these factors is without merit. *See, e.g.,* State v. Hall, 958 S.W.2d 679, 715 (Tenn. 1997), *cert. denied*, 524 U.S. 941, 118 S. Ct. 2358 (1998); State v. Brimmer, 876 S.W.2d 75, 86 (Tenn. 1994), *cert. denied*, 513 U.S. 1020, 115 S. Ct. 585 (1994). Additionally, the defendant's arguments have been repeatedly rejected by our supreme court. *See* State v. Thomas, 158 S.W.3d 361, 407 (Tenn. 2005) (Appendix); Vann, 976 S.W.2d at 117-18; State v. Keen, 926 S.W.2d 727, 742 (Tenn. 1994), *cert. denied*, 532 U.S. 907, 121 S. Ct. 1233 (2001).

2. The defendant asserts that imposition of the death penalty in this state is unconstitutional because the death sentence is imposed arbitrarily and capriciously in that:

a. unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty. This argument has been rejected by our supreme court. *See* Thomas, 158 S.W.3d at 407; State v. Hines, 919 S.W.2d 573, 582 (Tenn. 1995), *cert. denied*, 519 U.S. 847, 117 S. Ct. 133 (1996).

b. the death penalty is imposed in a discriminatory manner based upon race, geography and gender. This argument has been rejected by our supreme court. *See* Thomas, 158 S.W.3d at 407; Hines, 919 S.W.2d at 582; Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 268; State v. Smith, 857 S.W.2d 1, 23 (Tenn. 1993), *cert. denied*, 510 U.S. 996, 114 S. Ct. 561 (1993).

c. requiring the jury to agree unanimously to a life verdict violates McKoy v. North Carolina, 494 U.S. 433, 110 S. Ct. 1227 (1990) and Mills v. Maryland, 486 U.S. 367, 108 S. Ct. 1860 (1988). This argument has been rejected by our supreme court. *See* Thomas, 158 S.W.3d at 407; Reid, 91 S.W.3d at 313; Brimmer, 876 S.W.2d at 87; State v. Thompson, 768 S.W.2d 239, 250-51 (Tenn. 1989).

d. there is a reasonable likelihood that jurors believe they must unanimously agree as to the existence of mitigating circumstances because of the failure to instruct the jury on the meaning and function of mitigating circumstances. This argument has been rejected by our supreme court. *See* Thomas, 158 S.W.3d at 407; Thompson, 768 S.W.2d at 251-52.

3. The defendant asserts that the appellate review process in death penalty cases is constitutionally inadequate. Our supreme court has rejected this argument also. *See* Thomas, 158 S.W.3d at 408; Reid, 91 S.W.3d at 313; Cazes, 875 S.W.2d at 270-71. Moreover, our supreme court has held that, while important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required. *See* Bland, 958 S.W.2d at 663.

## CONCLUSION

Having fully reviewed the record and the applicable authority, we affirm the defendant's conviction of first degree murder. However, finding that the (i)(2) aggravating circumstance was erroneously applied, we reverse the judgment insofar as it imposes the sentence of death, and we remand to the trial court for a new sentencing hearing.

_____

J.C. McLIN, JUDGE